## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT R. PORTER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 04-1228 |
| v. | ) | Judge Nora Barry Fischer |
| | ) | |
| A. KING, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

I.      INTRODUCTION

This matter involves a claim by Plaintiff Robert R. Porter (hereinafter "Plaintiff" or "Porter"), a former prison inmate, that corrections officers Defendants Aaron King, William Orenbaun II and Charles Connor (hereinafter "Defendants" or "King," "Orenbaun," and/or "Connor") used excessive force against him in violation of his constitutional rights under the Eighth Amendment while he was incarcerated at the State Correctional Institution at Greene (hereinafter "SCI-Greene") in Greene County, Pennsylvania. A non-jury trial of this claim was conducted on February 17, 18 and 19, 2009 before the undersigned Judge. After the conclusion of the trial, the parties submitted proposed findings of fact and conclusions of law. (Docket Nos. 155, 157). Upon consideration of the trial record and the parties' submissions, and based on the following findings of fact and conclusions of law, judgment will be entered in favor of Defendants and against Plaintiff.

1

II.     FINDINGS OF FACT

The Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  FED.R.CIV.P. 52.

A.      *Procedural History*

This action was filed by Plaintiff *pro se* on August 17, 2004 (Docket No. 1) and the matter was referred to Magistrate Judge Lisa Pupo Lenihan.  Judge Lenihan granted Plaintiff's motion to proceed *in forma pauperis*, and his Complaint was filed on September 9, 2004. (Docket No. 3).  Plaintiff then filed an Amended Complaint on October 26, 2004.  (Docket No. 8).

Plaintiff's Amended Complaint contained two section 1983 claims against several corrections officers at SCI-Greene and their supervisors, alleging that they violated his constitutional rights under the Eighth Amendment.  *Id*.  The claims arose from alleged incidents which occurred on separate dates, September 16, and September 26, 2002.  *Id*.  The September 16, 2002 count alleged that Defendants King and Orenbaun used excessive force against him by removing him from his cell and engaging him in a fight.  *Id*.  Plaintiff also alleged that Defendant Connor facilitated their use of force by opening his cell after being directed by King and Orenbaun to do so, permitting King and Orenbaun to engage Plaintiff.  *Id*.; (*see also* Docket No. 78).  The September 26, 2002 count alleged that Defendant King used excessive force against Plaintiff while King was escorting Plaintiff to the law library and that Sergeant Durco failed to intervene and protect him from King's use of force.  *Id*.  Plaintiff further alleged that Sergeant Durco, unit manager Defendant Capozza, Lieutenant Ball, and Sergeant Negley failed to adequately train Defendants King and Orenbaun as corrections officers. *Id*.

Defendants filed a motion to dismiss both claims.  (Docket Nos. 28, 29).  Magistrate Judge

Lenihan filed a Report & Recommendation on October 24, 2006, recommending that the motion be denied. (Docket No. 36). No objections to the Report and Recommendation were filed and Judge Thomas M. Hardiman entered an order adopting it as his opinion and denying the motion to dismiss. (Docket No. 37).

On May 7, 2007, Defendants filed a motion for summary judgment and Plaintiff filed his response to same on May 21, 2007. (Docket Nos. 70, 73, 74). Thereafter, Magistrate Judge Lenihan filed a Report & Recommendation on October 30, 2007, recommending that the motion for summary judgment be granted. (Docket No. 78). Plaintiff filed objections to the Report & Recommendation on November 13, 2007. (Docket Nos. 79, 81). Then, on December 17, 2007, this Court granted Defendants' motion for summary judgment except as to Plaintiff's excessive force claim against Defendants Connor, King and Orenbaun for the alleged incident on September 16, 2002. (Docket No. 89).

On March 31, 2008, Judge Lenihan granted Plaintiff's motion for appointment of counsel. (Docket No. 93). Plaintiff then elected to have his case randomly assigned to a United States District Judge (Docket No. 95) and this case was referred to the undersigned Judge (Docket No. 102). After a series of attorneys declined requests to represent Plaintiff in this matter, Kristi L. Johnson, Esquire accepted a pro bono appointment to represent Plaintiff at trial and entered her appearance on September 12, 2008. (Docket No. 103). Co-counsel Robert J. Ridge, Esquire entered his appearance on September 18, 2008. (Docket No. 106).

Prior to the trial, the parties submitted joint factual stipulations and joint exhibits to be used at trial. (Docket Nos. 136, 143). The Court also ruled on several motions in limine, and resolved objections to the disputed exhibits. (Docket Nos. 138, 142). After pretrial proceedings were

3

concluded, Plaintiff's excessive force claim against Defendants Connor, King and Orenbaun stemming from the alleged September 16, 2002 incident was tried before this Court on February 17, 18, and 19, 2009.  (Docket Nos. 142, 143, 148-52).  Proposed findings of fact and conclusions of law followed.  (Docket Nos. 155, 157).  The Court now turns to its findings.

       B.    *Factual Findings*

       1.    <u>Witnesses and General Description of SCI-Greene</u>

On September 16, 2002, Plaintiff was incarcerated in the Special Management Unit (hereinafter, the "SMU") at SCI-Greene in Greene County, Pennsylvania, a maximum-security facility.  *Tr. 2/19/09* at 59.  The SMU is a unit for severely problematic inmates that cannot function in the general population of SCI-Greene due to assaultive behavior and/or have had numerous misconduct charges filed against them by prison staff.  *Tr. 2/19/09* at 37.  Plaintiff was held by the Department of Corrections (hereinafter, the "DOC") in custody level 5, the most confined level of custody where an inmate can be held.  *Tr. 2/19/09* at 39.  Inmates in custody level 5 are segregated and restricted to their cells for as much as 23 hours per day.  *Id*.  Plaintiff was housed at the SMU at SCI-Greene on H-block, B pod, a two-level housing unit that contained 24 cells.  *Joint Exhibit* 39.  He was incarcerated in cell number 10, which was a single cell located on the first floor.  *Tr. 2/17/09* at 16.  Plaintiff testified regarding his version of the events that occurred on September 16, 2002 as well as his general experiences at SCI-Greene.  His testimony was not credible.[1]

---

[1]

    In a non-jury trial, the court sits as trier of fact and is tasked with resolving factual disputes and assessing the credibility of witnesses.  *See Giles v. Kearney*, --- F.3d ---, 2009 WL 2032118, at *2 (3d Cir. July 15, 2009).  The Court's reasoning for its findings regarding the credibility of all witnesses is detailed below.

Defendant Connor was employed by the DOC from 1995 until 2008.[2]  *Tr. 2/17/09* at 105. On September 16, 2002, he was a corrections officer one (hereinafter, "CO1")[3] assigned to the control room on H-block in the SMU.  *Tr. 2/17/09* at 107.  The control room was located on the second floor of H-block and overlooked the A, B, C and D pods.  *Tr. 2/18/09* at 152.  Among other duties, Connor was responsible for overseeing the movement of inmates in the A, B, C, and D pods as well as locking and unlocking the inmates' cell doors when they were escorted to and from their cells.  *Id*.; *Tr. 2/17/09* at 107-8.  He testified credibly.

Defendant King has been employed by the DOC since 1999 through the present.  *Tr. 2/17/09* at 126.  On the date of the incident, he was a CO1 and was assigned to the H-block, B-pod, the pod where Plaintiff was housed.  *Tr. 2/17/09* at 127.  His duties were the control, care and custody of the inmates in B-pod, including escorting the inmates to the showers to permit them to use the showering facilities.  *Tr. 2/17/09* at 127-28.  He testified regarding his version of the events at issue and the subsequent investigation.  His testimony was credible.

Defendant Orenbaun has been employed by the DOC since 2000 through the present.  *Tr. 2/17/09* at 186. On the date in question, he was also a CO1.  *Id*.  While he was primarily assigned to the H-block, A-pod, an adjacent pod to the B-pod, he assisted the corrections officers in the other pods when needed, including assisting Defendant King by helping to escort inmates in H-block, B-pod to the showers.  *Tr. 2/18/09* at 11-12.  He offered credible testimony regarding the events and

---

[2]

As discussed in further detail below, Defendant Connor was terminated by the DOC in 2008. *Sealed Tr.* 2/18/09.

[3]

A corrections officer one is the second rank of corrections officers within the DOC.  *Tr. 2/18/09* at 107, 126. The first rank is a corrections officer trainee.  *Id.*  A corrections officer two or sergeant is the third rank.  *Id*. at 107.

the subsequent investigation.

Witness Andre Jacobs is a former inmate at SCI-Greene who remains in the custody of the DOC. *Tr. 2/18/09* at 36-7. On September 16, 2002, he was incarcerated in H-block, B-pod in the SMU at SCI-Greene. *Tr. 2/18/09* at 38. He testified regarding the alleged events of that date. His testimony was not credible given his bias in favor of Plaintiff and against the DOC as well as the inconsistencies in his testimony as compared to Plaintiff's.

Witness David Serrano is also a former inmate at SCI-Greene who remains in the custody of the DOC. *Tr. 2/18/09* at 70. He was incarcerated in H-block, B-pod in the SMU at SCI-Greene on the date of the alleged events. *Tr. 2/18/09* at 63-4. He offered testimony regarding the events of that date. His testimony was not credible due to his bias against the DOC, and the inconsistencies between his testimony and the DOC's cell history records.

Witness Brian Coleman has been employed by the DOC for over 20 years. *Tr. 2/18/09* at 99-100. He is currently the correctional superintendent at SCI-Fayette. *Tr. 2/18/09* at 99. He was a security captain at SCI-Fayette on September 16, 2002. *Tr. 2/18/09* at 102-3. His duties as security captain included handling internal investigations of inmate abuse. *Id.* He testified credibly regarding the investigation of the abuse allegations made by Plaintiff arising from the incidents in question and generally about SCI-Greene and the DOC.

Witness Lori Lapina was employed by the DOC for approximately four years and six months as a physician's assistant, and was working at SCI-Greene on the date of the alleged incident. *Tr. 2/18/09* at 161. She is currently employed by Western Psychiatric Institute and Clinic in a similar capacity. *Id.* She testified credibly regarding her duties as a physician's assistant and her examination of Plaintiff on September 17, 2002.

6

Witness Lorinda Winfield has been employed by the DOC at SCI-Greene for 11 years. *Tr. 2/19/09* at 5. She is currently a major of unit management at that facility, but on September 16, 2002, her rank was captain. *Tr. 2/19/09* at 5-6. Her duties as a captain included supervising the lieutenants, sergeants and corrections officers who were working on her shift. *Tr. 2/18/09* at 6. She testified regarding Defendants King and Orenbaun's delayed reporting of the incident in question as well as generally regarding the operations of SCI-Greene. Her testimony was also credible.

2.      Undisputed Facts[4]

Plaintiff was escorted to the showers on September 16, 2002 by Defendants King and Orenbaun at approximately 3:00 p.m. The Department of Corrections has written procedures for the removal of an SMU inmate from his cell. Generally,

> Plaintiff, whenever removed from his cell, should have been (1) strip-searched before being handcuffed; (2) following completion of the strip-search, handcuffed utilizing a belt and cuffs or by handcuffing Plaintiff with his hands behind his back with the palms out; (3) that Plaintiff's cell door should not have been opened without at least two correction officers present.

(*Pretrial Stipulations*, Docket No. 136 at ¶ 2c). "[T]he following restraints should have been required to be applied to Plaintiff for any inmate movement within the Unit: handcuffs, security belt, cuff retainer and tether." *Id.* at ¶ 2j. The use of leg shackles by corrections officers to secure Plaintiff was optional. *Id.*

There are more specific procedures for cell removal if Plaintiff was escorted to the showers. "Plaintiff should have been strip-searched and handcuffed behind the back, palms out or with a waist

---

[4]

The undisputed facts are compiled from the parties' joint stipulations (Docket No. 136), as well as the parties' proposed findings of fact and conclusions of law and responses to same (Docket Nos. 155, 157, 158 and 159).

belt before his cell door was opened for the escort by Defendants King and Orenbaun to the shower on the date of the Incident." *Id*. at ¶ 2h.  In addition, "when removing an inmate from the shower, he should be handcuffed through the aperture in the shower door, escorted by at least two officers, and secured in his or her cell." *Id*. at ¶ 2i.

The showers in the H-block, B-pod are located on the first floor and are approximately three cells from cell 10 where Plaintiff was housed.  (Docket No. 155 at ¶ 6); *Joint Exhibit* 39.  In preparation for his shower, Plaintiff was handcuffed and dressed in boxer shorts and sandals, with a towel around his waist, carrying his soap and washcloth.  *Tr. 2/17/09* at 31-32.  He was then escorted to the shower by Defendants King and Orenbaun at 3:00 p.m. in accordance with all procedures and without incident.  *Id*.  The inmates are generally given 15 minutes to shower.  *Tr. 2/17/09* at 31, 140.  While Plaintiff was showering, either Defendant King or Orenbaun verbally reprimanded Plaintiff for taking too much time to finish his shower.  *Tr. 2/17/09* at 33.  After he finished with his shower, at approximately 3:15 p.m., Plaintiff exited the shower area by standard procedure, i.e., he was handcuffed through the aperture in the door, and escorted by Defendants King and Orenbaun, with one of them holding his arm and the other holding the tether.  *Tr. 2/17/09* at 33, 149.

3.    Disputed Facts

At trial, the witnesses' versions of the events that transpired diverge after Plaintiff was finished with his shower.  Upon consideration of the two vastly different versions of events and the credibility of the witnesses, the Court accepts the version of Defendants and their witnesses and rejects the Plaintiff's version.  The Court will first discuss Plaintiff's version and then turn to Defendants'.

a.      Plaintiff's Version of Events and Credibility Determinations

Plaintiff testified that Defendants King and Orenbaun continued to chastize him for taking too long in the shower while escorting him to his cell. *Tr. 2/17/09* at 34. He explained that there was "animosity" between him and the officers during the escort, but that they placed him in his cell without incident. *Id*. After Plaintiff was placed in his cell, he put on ointment and dressed himself. *Id*. He then went to the window of his cell to look into the common area. *Tr. 2/17/09* at 34-5. He said that the officers remained in the common area but were "gritting on" him or staring at him as he stood at his window. *Id*. at 35. The officers then approached Plaintiff's cell, making derogatory remarks toward him, including calling him a pedophile, child molester, snitch and the "n-word." *Id*. At some point during this exchange, Officer Orenbaun grabbed his private area and said "suck this, pussy Porter." *Id*. Plaintiff responded to this comment by telling him, "I'll bet you ain't man enough to open this door and say that to my face like a man." *Id*. Both officers reacted by saying "yes, we will, you're a pussy." *Id*.

Plaintiff testified that the officers then backed up a few feet from the cell door and motioned toward Defendant Connor in the control room, telling him to open up cell 10. *Id*. Connor obliged, hitting the button in the control room to open the door. *Id*. Defendant Orenbaun then pulled the door open and both officers reached at Plaintiff. *Tr. 2/17/09* at 36. Plaintiff remained un-handcuffed as Orenbaun opened the door. *Tr. 2/17/09* at 80. The officers both grabbed Plaintiff by his hair, and pulled him into the common area. *Id*.

Plaintiff and the two officers then engaged in what Plaintiff described as "an all out battle" throughout the common area, during which he and the officers wailed punches at each other. *Tr. 2/17/09* at 36-40. He stated that at some point during the "battle," he hit Defendant King square in

9

the face, causing his nose to bleed.  *Id*.  He testified that while the officers threw multiple punches

at him, he was not injured by their blows because neither could punch hard.  *Tr. 2/17/09* at 49, 91.

However, Plaintiff caused Orenbaun to stumble to the ground, at which time Orenbaun put him in

a bear hug from his knees.  *Tr. 2/17/09* at 37.  Orenbaun then grabbed Plaintiff's testicles with both

hands, twisting and squeezing them with extreme force.  *Tr. 2/17/09* at 37-40.  The pain caused

Plaintiff to scream and fall to the ground, hitting his shoulder and head off of the base of a cell door.

*Tr. 2/17/09* at 40.  The officers then kicked him while he was on the ground,  dragged him back into

his cell, and slammed the cell door.  *Tr. 2/17/09* at 40-41, 45.  Plaintiff testified that after he was

back in his cell, he laid on the floor of his cell for some period of time and was very disoriented.  *Tr.*

*2/17/09* at 42-43.  He explained that after the adrenaline from the fight had worn off, he experienced

pain in his chest, head, and other areas of his body.  *Tr. 2/17/09* at 44.  He also said that he had

numbing pain in his testicles and that his penis was swollen as a result of Defendant Orenbaun

grabbing and squeezing his private area.  *Tr. 2/17/09* at 43-44.

 The Court does not find Plaintiff's testimony to be credible for several reasons.  Based on

his demeanor on the witness stand and his testimony, he was clearly biased against the DOC and

Defendants King and Orenbaun.  He repeatedly insulted King and Orenbaun by testifying that neither

could punch or hit hard.  *Tr. 2/17/09* at 49, 91.  He offered little or no explanation as to why the "all

out battle" had occurred.  *Tr. 2/17/09* at 36-40.  Plaintiff stated only that there was "animosity"

between him and the officers during the escort from the showers to his cell due to the length of his

shower and that he had challenged the officers to a fight after the officers verbally assaulted him.

There is no evidence of record to suggest that either King or Orenbaun were prone to violence or had

previous encounters with Plaintiff which would have led them to assault him in the manner

described.

Moreover, Plaintiff was a dangerous level 5 inmate housed in the Special Management Unit of SCI-Greene. *Tr. 2/17/09* at 173. Plaintiff is above average height, athletic build, testified that he exercised daily while incarcerated and that he was a "tough guy." *Tr. 2/17/09* at 21, 91. The officers testified that Plaintiff was dangerous while handcuffed and that they were unarmed. *Tr. 2/18/09* at 13; *Tr. 2/17/09* at 173, 191. It is highly unlikely that two veteran corrections officers would engage a dangerous, un-cuffed inmate in a jail house brawl after permitting him to change into his DOC issued jumpsuit and shoes. It is even less likely that the officers would engage Plaintiff in such a fight in the common area of H-block, B-pod, in full view of 23 other inmates, an officer in the H-block control room (Defendant Connor), and the closed circuit video cameras which projected a live feed into the jail's main control room that were constantly monitored by a captain or some other officer that outranked Defendants King and Orenbaun.[5]

Plaintiff's medical records also do not support his version of the events. At approximately 19:00 hours or 7:00 p.m., Plaintiff was removed from his cell and escorted by corrections officer Naylor and Sergeant Negley out of B-pod to an examination room for a medical exam. *Tr. 2/17/09* at 157; *Joint Exhibit* 43. The escort and the exam were videotaped by DOC staff; the video was played in open court and admitted into evidence. *See Joint Exhibit 43*. On the video, Plaintiff walks without a limp or any other noticeable effects from the altercation. *Id*. During the examination by

---

[5]

The Court recognizes that Plaintiff has raised issues regarding the lack of a video recording of the alleged assault by the video camera stationed in the B-pod during the incident, including requesting that an adverse inference be made against Defendants due to alleged spoliation of evidence. (Docket Nos. 157, 160). As discussed in further detail below, the Court credits the testimony of Defendants' witnesses and finds that the camera did not have the capability of recording during the incident and, therefore, no videotape was created of the events in question.

11

Nurse Jones, Plaintiff does not appear to be in pain and her continued touching of Plaintiff does not cause any severe reactions that one would expect from an individual that had serious internal injuries. *Id.* The close-ups of Plaintiff's head, body and penis on the video and in the photographs taken by Nurse Jones do not show any serious external injuries.[6] *Id.*; *Joint Exhibit* 7. Nurse Jones' report prepared after this exam reflects the same. *Joint Exhibit* 28.

Plaintiff made a sick call on September 17, 2002 and a medical exam was conducted by Lori Lapina, a physician's assistant, at 14:00 hours or 2:00 p.m. on that date. *Tr. 2/18/09* at 162. Lapina testified and her notes from that exam state that Plaintiff was complaining of severe pain in his genitals, but she found that his subjective complaints did not comport with his physical symptoms, i.e., that he was not acting how someone that was under the amount of pain he described would likely be acting. *Tr. 2/18/09* at 168; *Joint Exhibit* 8. She explained that Plaintiff spent the entire exam massaging his genitals in front of her until she was forced to terminate the exam due to this disrespectful behavior. *Tr. 2/18/09* at 169, 172. Lapina ordered that a urinalysis be conducted. She testified that the records indicate that Plaintiff had three times the normal amount of blood in his urine but that it was otherwise normal. *Tr. 2/18/09* at 170. She did not recall reviewing the results of Plaintiff's urinalysis and offered no explanation as to why a follow-up test was not ordered. *Tr. 2/18/09* at 172. However, she did explain that blood found in a person's urine could potentially be the result of a medical condition or trauma, including some type of self-inflicted trauma. *Id.*

---

[6]

To the extent that the photographs show some minor swelling of Plaintiff's face, the Court finds that the swelling was not a serious injury and was likely caused during use of a control technique by Defendants Orenbaun and King to place Plaintiff on the wall of B-pod after he made an aggressive move towards them, as discussed in further detail below. (*See* Docket No. 158 at ¶¶ 154, 158).

The Court accepts as a fact that three times the normal amount of blood was found in Plaintiff's urine in the September 17, 2002 urinalysis.  However, the Court does not find that this fact supports Plaintiff's alleged version of the events.  First, there was no testimony at trial by a medical professional that the blood in his urine was actually caused by the type of trauma described by Plaintiff.  Second, there is no evidence that the restraints placed on Plaintiff by Defendants King and Orenbaun during the unplanned use of force (which the Court accepts as the true version of events that are further detailed below) are casually linked to the blood found in his urine.  Third, the urinalysis was conducted more than 24 hours after the events in question, and, aside from the time Plaintiff spent outside of his cell during the videotaped medical exam conducted by Nurse Jones, Plaintiff was confined by himself in his cell during this time.  As he was fondling his genital area in front of Lapina the next day, it is reasonable to conclude that he would do the same in the privacy of his single cell, potentially causing himself injury.

The Court also did not find the testimony of former SCI-Greene inmates, David Serrano and Andre Jacobs, who testified in support of Plaintiff, to be credible.  Like Plaintiff, both were biased against Defendants as each have filed grievances and lawsuits against the DOC and corrections officers at SCI-Greene.  Jacobs testified that he had filed numerous grievances against SCI-Greene and estimated that he had filed in excess of ten lawsuits against the DOC, including one against SCI-Greene and Sergeant Durco, who was initially a defendant in this action.  *Tr. 2/18/09* at 43.  Jacobs lost the lawsuit against Durco after a trial approximately two weeks prior to his testimony in the instant case.  *Tr. 2/18/09* at 56-7.  Serrano testified that he had previously filed grievances against Orenbaun, Connor or King and that he had filed a lawsuit against SCI-Greene that was on appeal

before the United States Court of Appeals for the Third Circuit at the time of trial.[7]  *Tr. 2/18/09* at 94-95.

There were inconsistencies and credibility issues with the testimony of each witness.  Jacobs initially testified that he knew Plaintiff from being incarcerated with him at SCI-Greene and county prison.  *Tr. 2/18/09* at 36.  However, Jacobs and Plaintiff have a familial relationship as Jacobs' mother and Plaintiff are cousins.  *Tr. 2/17/09* at 97; *Tr. 2/18/09* at 44-5.  Jacobs testified that after witnessing the alleged events, he did not attempt to call to Plaintiff through his cell door to determine if he was alright or contact medical to help him, despite his ability to do so.  *Tr. 2/18/09* at 44-48.  He explained that he and Plaintiff had their "differences" in prison because Plaintiff, who is older than he, attempted to direct him to do things while incarcerated which conflicted with his belief that he "[stood] as his own man in prison, whether or not a person is related to me."  *Tr. 2/18/09* at 44.  The Court does not find credible Jacobs' explanation.  Further, Jacobs was confined in cell 23, on the second floor.  *Tr. 2/18/09* at 38.  Based on the witnesses' description of B-pod and the Court's viewing of the video, Jacobs' view of the events from the small window on his cell door was very limited, at best.  *Tr. 2/18/09* at 38-39.

Jacobs' testimony also contradicted Plaintiff's in several respects.  He testified that it was Defendant King and not Defendant Orenbaun who was on the floor and grabbed Plaintiff's testicles.  *Tr. 2/18/09* at 39, 48. King and Orenbaun look nothing alike. King is of average height and build while Orenbaun is six foot two inches tall and muscular, a very large man.  *See Tr. 2/17/09* at 190-91; *Tr. 2/18/09* at 13.  Jacobs also testified that he did not witness Plaintiff throw any punches

---

[7]

The Court notes that Serrano's appeal was recently denied by the Court of Appeals. *See Serrano v. Folino, et. al*, 2009 WL 2251433 (3d Cir. July 29, 2009)(not precedential).

toward the officers or bloody King's nose, but described the entire episode as one-sided, characterizing it as a "pretty bad beat down" by the officers against Plaintiff. *Tr. 2/18/09* at 52-53. He explained that Orenbaun held Plaintiff while King repeatedly punched him in the face. *Tr. 2/18/09* at 48. This version of events is totally inconsistent with Plaintiff's testimony that he threw many blows during the "all out battle" that he described. *Tr 2/17/09* at 36-40.

Serrano's demeanor at trial was such that this Court did not find him to be credible. In addition, Serrano's cell history demonstrates that he was in cell 22 on the second floor of B-pod from July 22 until November 16, 2002, including the date of the incident. *Joint Exhibit* 44. However, he testified that he was in cell 9, the cell next to Plaintiff's, on the date in question. *Tr. 2/18/09* at 74. He explained that he was never housed on the second floor because he had a "medical approval cell status" which required him to be incarcerated on the first floor. *Tr. 2/18/09* at 73, 92. He had this special medical status because of a torn ligament in his knee. *Id*. His cell history demonstrates otherwise, providing instead that he was housed on the second floor of H-block, B-pod both prior to the incident and during the following time periods after the incident: cell 14 from November 16 through December 11, 2002; cell 13 from July 17 through September 30, 2003; and cell 20 from March 8 through April 7, 2004. *Joint Exhibit* 44. The Court finds that Serrano was housed in cell 22 on the date of the incident. Thus, given that Serrano's entire testimony was from the perspective of his stated location in cell 9 directly in front of the alleged events involving Plaintiff and the officers, the Court rejects his entire testimony as fabricated.[8] *Tr. 2/18/09* at 65. Further, Serrano's

---

[8]

"Like any factfinder, [a district court] can accept some parts of a party's evidence and reject others. It may also, like any factfinder, assess credibility in light of the maxim, *falsus in uno, falsus in omnibus* ... defined as 'false in one thing, false in everything.'" *Bennun v. Rutgers State University*, 941 F.2d 154, 179 (3d Cir. 1991)(quoting Black's Law Dictionary 543 (5th ed.

credibility is questioned because he drafted and signed an affidavit for this case at Plaintiff's request on December 28, 2006, four years after the incident, while the two were both incarcerated at SCI-Camp Hill. *Tr. 2/17/09* at 98; *Tr. 2/18/09* at 86, 91; *Plaintiff's Exhibit* 2. Indeed, he testified that he learned about Plaintiff's lawsuit while incarcerated at SCI-Camp Hill and that he specifically asked Plaintiff for the date of the incident so that he could include it in the affidavit. *Tr. 2/18/09* at 69, 86.

For all of the above stated reasons, the Court rejects Plaintiff's version of events. The Court now turns to Defendants' version.

> b.      Defendants' Version of Events and Credibility Considerations

Defendants King and Orenbaun each testified that they executed a control technique against Plaintiff while they were escorting him from the showers to his cell and that it was an "unplanned use of force." *Tr. 2/17/09* at 142, 164-65, 191. An unplanned use of force is an incident in which a corrections officer uses a hands' on technique to control an unruly inmate without resorting to the use of any other instruments or equipment to aid them. *Tr. 2/17/09* at 142; *Tr. 2/19/09* at 30-1. Pursuant to DOC policy,

> a. ... use of force against an inmate is authorized when the acting staff member reasonably believes such force is necessary to accomplish, inter alia, protection of self or others.
>
> b. ... the amount of force, when used, should be the least amount of

---

1979)). *See also Logue v. International Rehabilitation Associates, Inc.*, 683 F.Supp. 518, 518 (W.D.Pa. 1988), *judgment aff'd*, 866 F.2d 1411 (3d Cir. 1988) and *judgment aff'd*, 866 F.2d 1410 (3d Cir. 1988)(during a non-jury trial, a court "may follow the ancient legal maxim *falsus in uno, falsus in omnibus* in weighing the testimony, as it frequently does in instructing juries.").

force reasonably necessary to achieve the authorized purpose for which it is to be used and the use of force will stop once control is achieved.

[and]

c. ... force is not authorized as a means of punishment or revenge.

(*Pretrial Stipulations*, Docket No. 136 at ¶¶ 3a, 3b, 3c).  Corrections officers are trained in the amount of force to be used to neutralize an inmate.  *Tr. 2/19/09* at 36.  The DOC policies refer to the different types of force that could potentially be used by a corrections officer securing an inmate as the "use of force continuum."  *Tr. 2/19/09* at 31.  The levels of force on the continuum range from a control technique to deadly force, with the amount of force authorized to be used varying depending on the precise situation.  *Tr. 2/19/09* at 31-2.

On September 16, 2002, the officers were engaged in a verbal exchange with Plaintiff about the length of his shower during the escort from the showers to his cell.  (Docket No. 155 at ¶ 14).  While he was being escorted, Plaintiff made an aggressive move toward the officers, by lunging or attempting to kick them, which necessitated King and Orenbaun using a control technique to place Plaintiff against the wall.  *Tr. 2/17/09* at 142, 173, 191.  King testified that he and Orenbaum used this control technique in order to protect themselves from Plaintiff, and that Plaintiff was placed against the wall for approximately two seconds.  *Tr. 2/17/09* at 147.  King also explained that using force to place an inmate against the wall is classified as the second to the lowest type of force on the use of force continuum as set forth in the DOC policies.  *Tr. 2/17/09* at 170.  After Plaintiff was secured and the officers determined that he was no longer a threat, he was placed in his cell.  *Tr. 2/18/09* at 11.

At no time did Defendant King punch, kick or otherwise strike Plaintiff.  *Tr. 2/17/09* at 170,

17

182-83.  Likewise, Defendant Orenbaun did not punch, kick, strike or grab Plaintiff's genitals at any time.  *Tr. 2/18/09* at 15.  Neither King nor Orenbaun witnessed the other use these types of force against Plaintiff. *Tr. 2/17/09* at 170; *Tr. 2/18/09* at 15. Defendant Connor corroborated the same, testifying that he did not view either officer applying any force against Plaintiff, including that he did not see the officers place Plaintiff against the wall.  *Tr. 2/17/09* at 123. Moreover, neither of the officers motioned to Defendant Connor to unlock Plaintiff's cell door after he was returned to his cell following his shower, and Plaintiff's door was not unlocked by Connor.  *Tr. 2/17/09* at 117-18; *Tr. 2/18/09* at 11.

The Court finds that the unplanned use of a control technique in this instance was executed by King and Orenbaun in accordance with DOC policy due to the aggressive movement made by Plaintiff in either lunging or attempting to kick Plaintiff.  *See Joint Exhibit* 41.  This aggressive move threatened the safety of the officers, who then applied minimal force to Plaintiff by placing him against the wall for the purpose of securing him and preventing injury to themselves.

The Court also finds the testimony of the officers to be credible.  During his testimony Defendant Connor disclosed to the Court the reasons for his termination from SCI-Greene.[9]  *Sealed Tr. 2/17/09*.  The Court found Connor's testimony regarding his termination from SCI-Greene to be truthful and forthright and, similarly, found his testimony regarding the events that occurred in the case at bar to be credible.  *Id*.  Importantly, he testified that he did not view King or Orenbaun use any force against Plaintiff.  *Tr. 2/17/09* at 123.

---

[9]

As those reasons involved separate litigation between Connor and the DOC, the Court agreed to seal that portion of the transcript.  *Sealed Tr. 2/17/09*.

Defendants King and Orenbaun were reprimanded by their superior officer for the length of time it took them to report the incident, which was approximately three hours. *Tr. 2/17/09* at 151-52. Their superiors believed that the time lapse was in violation of DOC policy, which provided, in relevant part, that:

> e. ... (1) any staff member who uses physical force is required to report such action to the Shift Supervisor as soon as possible; (2) the Shift Supervisor is required to ensure that all necessary written reports are completed for reporting the incident to the Facility Manager, or other appropriate staff as directed, as soon as possible; and (3) the Facility Manager is required to report the incident to the Office of the Secretary in accordance with DOC policy 6.7.9, "Reporting of Extraordinary Occurrence." [and,]
>
> f. ... all use of force incidents are to be reviewed by the Facility Manager for an evaluation regarding, inter alia, policy violations, appropriateness of staff/inmate interaction, appropriateness of staff actions, training needs as they relate to the decision making of the staff involved, appropriateness of the level of force used, any potentially problematic issues, and recommendations or follow-up actions.

(*Pretrial Stipulations*, Docket No. 136 at ¶¶ 3e, 3f). Major Winfield identified two reasons that the DOC requires that incidents be reported as soon as possible: (1) there are numerous false claims of injury by inmates and the inmate has the ability to injure himself in his cell to support a false claim; and (2) so that an inmate could receive immediate medical attention if that inmate was injured. *Tr. 2/19/09* at 45-6.

Defendants King and Orenbaun testified that they did not immediately report the unplanned use of force against Plaintiff to their superior officers because they continued to finish their duties by escorting the remaining inmates in B-pod to the showers. *Tr. 2/17/09* at 173, 198; *Tr. 2/18/09* at 20. After all of the inmates had showered, Defendants notified their superior officer of the

unplanned use of force prior to the end of their shifts. *Tr. 2/18/09* at 16. King reported the use of force to Sergeant Negley at approximately 16:30 or 4:30 p.m. *Tr. 2/17/09* at 150. Likewise, Orenbaun reported the use of force report at approximately 4:30 p.m. and Lieutenant Ball instructed him to fill out a use of force report. *Tr. 2/17/09* at 198-99. Lieutenant Ball informed then-Captain Winfield of the use of force at 18:45 or 6:45 p.m. *Tr 2/19/09* at 11. Winfield ordered Lieutenant Ball to instruct the officers to report any use of force at the time of the incident and to not wait until three hours after the incident. *Tr. 2/19/09* at 17. The message was then relayed to Defendants King and Orenbaun, who were also directed to fill out extraordinary occurrences reports, which they did. Winfield testified that Ball later assured her that he had instructed the officers in this manner. *Tr. 2/19/09* at 17.

While Defendants may have been informally reprimanded that their conduct in not immediately completing a report was in violation of DOC policy, the Court does not find the same to have been egregious under the circumstances. King and Orenbaun used minimal force against Plaintiff after he had attempted to strike them and Plaintiff was not seriously injured by the use of force. They then finished their duties that were in progress, i.e., supervising inmate showers, and reported the incident to their superior officers. *Tr. 2/17/09* at 173; *Tr. 2/18/09* at 20.

Prior to the end of his shift, Defendant King also filed a misconduct report against Plaintiff due to the incident. *Tr. 2/17/09* at 158-59; *Joint Exhibit* 3. The misconduct report alleged that Plaintiff threatened an employee in his attempt to kick the officers and refused to obey an order by not completing his shower in a timely manner. *Tr. 2/17/09* at 160-64; *Joint Exhibit* 3. This report was provided to Plaintiff at 20:20 or 8:20 p.m. *Tr. 2/17/09* at 159. The Court does not find that this delay impinges on King and Orenbaun's character but merely reflects the fact that the use of a

control technique after an inmate had attempted to strike them was not an extraordinary occurrence and as such, they did not believe it required their immediate reporting.  While the incident was extraordinary in the sense that the officers were required to report its occurrence, use of control techniques by officers was common in the SMU.  *Tr. 2/19/09* at 36.  The facts that the need for control techniques was common in the SMU and that neither King nor Orenbaun were struck by Plaintiff support the Defendants' testimony outlining their reasoning for not re-filing the misconduct after it was dismissed without prejudice due to insufficient evidence.  King testified that he was off work due to vacation and then simply did not re-file the misconduct upon his return.  *Id*. at 176, 183.  Likewise, Defendant Orenbaun did not file a misconduct against Plaintiff after the charge filed by Defendant King was dismissed.  *Tr. 2/17/09* at 197.  In addition, it was not uncommon for misconduct charges filed against inmates to be dismissed without prejudice.  *Tr. 2/17/09* at 176.

Plaintiff filed a grievance against Defendants King and Orenbaun as a result of the incident.  During the ensuing investigation of this grievance, each of the officers gave written statements and were interviewed by Captain Coleman.  *Joint Exhibits* 33, 34, 35; *Tr. 2/17/09* at 201.  Each of their statements comported with the testimony given at trial and any inaccuracies between the testimony and the various reports were minimal.  Hence, their testimony of the events is credible.

c.      Alleged Spoliation of Evidence

Plaintiff has also repeatedly argued that Defendants' failure to produce the surveillance video from the date in question should be held against them, possibly through an adverse inference made against Defendants due to alleged spoliation of evidence.[10]  (Docket Nos. 157, 160).  The Court does

---

[10]

        "'Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'"  *Centimark*

not find the same to be warranted given its factual findings outlined above as well as the credible testimony at trial that the video surveillance cameras did not have recording capability at the time of the incident. *Tr. 2/17/09* at 113; *Tr. 2/18/09* at 129, 152. Specifically, Defendant Connor testified that the digital video cameras at SCI-Greene currently record 24 hours a day, 7 days a week. *Tr. 2/17/09* at 113. However, he explained that the cameras did not record continuously for some time prior to that as the cameras were on a loop which recorded only during certain times. *Id.* Captain Coleman testified that the cameras did not begin recording until 2004. *Tr. 2/18/09* at 129, 152. As a result of this testimony, which the Court finds to be credible, the fixed surveillance video camera in B-pod did not have the capability to record on September 16, 2002. Hence, the Court finds that a videotape of the incident in question could not have been created.[11] In addition, Defendants King

---

*Corp. v. Pegnato & Pegnato Roof Management, Inc.*, Civ. A. No. 05-708, 2008 WL 1995305, at *5 (W.D.Pa. May 6, 2008)(quoting *Mosaid Technologies, Inc. v. Samsung Electronics Co.*, 348 F.Supp.2d 332, 335 (D.N.J.2004)). District courts have discretion to sanction a party for spoliation of evidence, including that an adverse inference be made against a party. *Id.*; *See also Schmid v. Milwaukee Electric Tool Corp.*, 13 F.3d 76, 79 (3d Cir.1994).

[11]

    Plaintiff argues that such a finding is contrary to the parties' pretrial stipulation regarding the video surveillance camera in the B-pod. (Docket No. 160). The Court disagrees for the following reasons.

    Generally, pretrial stipulations as to facts entered into between parties are binding on the parties and the Court. *See* 73 AMERICAN JURISPRUDENCE 2D STIPULATIONS § 7 (2009); *see also Gander v. Gander*, 250 F.3d 606, 609 (8th Cir. 2001). It is also "a well-recognized rule of law that valid stipulations entered into freely and fairly, and approved by the court, should not be lightly set aside" given that stipulations "promote judicial economy by narrowing the issues in dispute during litigation." *Waldorf v. Shuta*, 142 F.3d 601, 616 (3d Cir. 1998). However, the construction and interpretation of a stipulation is determined by the Court, which applies general principles of contract law to determine its meaning by ascertaining the parties' intent when entering into the stipulation. *Washington Hospital v. White*, 889 F.2d 1294, 1299-1300 (3d Cir. 1989). "In interpreting a stipulation, courts should consider its plain language and the circumstances surrounding the formation of the stipulation which may explain its meaning." *Waldorf*, 142 F.3d at 612 (internal quotation omitted). Moreover, "[t]o be unambiguous, an agreement must be reasonably capable of

and Orenbaun each testified that they did not believe that they were authorized to attempt to access any videotapes. *Tr. 2/17/09* at 155-56, 202; *Tr. 2/18/09* at 10. As a consequence, the Court will not make an adverse inference against Defendants as a result of the failure to produce the videotape evidence in this matter. *See Schmid*, 13 F.3d at 78-79.

## III.    CONCLUSIONS OF LAW

"After conviction, the Eighth Amendment serves as the primary source of substantive protection in cases where an inmate challenges a prison official's use of force as excessive and unjustified." *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000)(citing *Whitley v. Albers*, 475 U.S. 312, 327 (1986)). The proof required for an Eighth Amendment violation "varies according to the nature of the alleged constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). In an excessive force claim, courts must determine "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

---

only one construction." *Washington Hosp.*, 889 F.2d at 1301.

In this Court's estimation, the stipulations referenced by Plaintiff are ambiguous as they do not unequivocally state that a video recording of the September 16, 2002 events had been created. Instead, the stipulations provide that: "1) SCI-Greene Special Management Unit's September 16, 2002 fixed camera, or surveillance camera, video footage has been lost or destroyed..." and "all tapes of use of force situations, either from fixed mounted or hand held cameras ... involved in the use of force situation are turned into the Shift Commander prior to the staff leaving for the day." (Docket No. 136 at ¶¶ 2l, 3c). It is not clear that Defendants agreed to concede that a videotape was created by the surveillance camera or if they agreed only that there was no videotape available to provide to Plaintiff during the discovery process. The Court is not privy to counsel's negotiations regarding the stipulation, but if Plaintiff's position was that a stipulation regarding the recording capability of the surveillance camera was necessary, he should have drafted an unequivocal stipulation. Plaintiff's argument is also undermined by his counsel's examination of the witnesses at trial as the testimony of both Connor and Coleman regarding the surveillance camera's capability was elicited via direct examination of those witnesses by Plaintiff's counsel. *See Tr. 2/17/09* at 112-13; *Tr. 2/18/09* at 129. In light of the foregoing and upon consideration of the credible testimony at trial that the camera did not have recording capability, the Court concludes that a videotape was not created by the surveillance camera on September 16, 2002. Therefore, a spoilation inference is not warranted.

23

*Hudson*, 503 U.S. at 7.   Further,

> [i]n determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them"; and (5) "any efforts made to temper the severity of a forceful response."

*Brooks*, 204 F.3d at 106 (quoting *Whitley*, 475 U.S. at 321); *see also Giles*, 2009 WL 2032118, at *7 (quoting same).  The absence of serious injury is a relevant, but not dispositive, additional factor to be considered in the subjective analysis.  *Id*.  Moreover, "[d]eference is given to prison officials' adoption and execution of policies to preserve internal order, discipline and security." *Giles*, 2009 WL 2032118, at *7 (citing *Bell v. Wolfish*, 441 U.S. 520, 547, (1979)).  Finally, an inmate has the burden to prove beyond a preponderance of the evidence that excessive force was used by the corrections officers.  *See Edwards v. City of Philadelphia*, 860 F.2d 568, 572-73 (3d Cir. 1988).

Here, the control technique executed by Defendants King and Orenbaun was applied in a good faith effort to restore discipline after Plaintiff had made an aggressive move toward them.  The amount of force used, placing Plaintiff against the wall for approximately two seconds, was the minimal amount of force needed given the circumstances.  No serious injuries were inflicted upon Plaintiff as a result of the unplanned use of force.  With respect to the blood found in Plaintiff's urine on September 17, 2002, Plaintiff did not prove by a preponderance of the evidence that the blood in his urine was caused by trauma resulting from the control technique applied to him by Defendants King and Orenbaun on September 16, 2002.  He offered no medical evidence, through expert testimony or otherwise, to support causation between the blood in the urine finding and the

Plaintiff's contact with the corrections officers.  *See Tr. 2/18/09* at 170-72.

While he remained handcuffed during the incident, Plaintiff was a dangerous level 5 inmate. Therefore, the officers reasonably perceived Plaintiff's aggressive movement as a threat to their safety.  Finally, given the location of the incident near the wall in the common area of B-pod, placing Plaintiff forcefully against the wall as opposed to tackling him to the floor or using some other type of force was a tempered response by the officers.  The force used was not applied maliciously or sadistically in a manner to cause harm to Plaintiff.  Accordingly, judgment will be entered in favor of Defendants King and Orenbaun and against Plaintiff.

Defendant Connor did not witness or have any connection to the unplanned use of force executed against Plaintiff by King and Orenbaun.  As a result, judgment will also be entered in his favor and against Plaintiff.

IV.     CONCLUSION

Based on the foregoing, judgment will be entered in favor of Defendants, Aaron King, William Orenbaun II and Charles Connor and against Plaintiff, Robert Porter.  An appropriate Order follows.


                                        *s/Nora Barry Fischer*
                                        Nora Barry Fischer
                                        United States District Judge


Date:   August 3, 2009

cc/ecf:  All counsel of record